UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
TREVOR JOHNSON,

                    Plaintiff,

        - against -

CITY OF NEW YORK; NEW YORK
DEPARTMENT OF EDUCATION; NYC
SCHOOL SUPPORT SERVICES; LOCAL
32BJ OF THE SERVICE EMPLOYEES
INTERNATIONAL UNION; WILLIAM J.
GERHARDT, JR., in his individual and official
capacity; DANIEL MORGAN, in his
individual and official capacity; ROBERT
STILES, in his individual and official capacity;
PAUL AUTAR, in his individual and official
capacity; JOHN DOE, in his individual and
official capacity; and JANE DOE, in her
individual and official capacity,

                    Defendants.
-------------------------------------------------------X

**MEMORANDUM & ORDER**
17-CV-7585 (PKC) (RER)

PAMELA K. CHEN, United States District Judge:

       Plaintiff Trevor Johnson brings this action against Defendants City of New York; the New

York City Department of Education ("DOE"); NYC School Support Services ("NYCSSS");

William J. Gerhardt, Jr.; Daniel Morgan; Robert Stiles; Paul Autar; and unidentified DOE officers

and/or employees John and Jane Does (collectively, "Municipal Defendants"); as well as Local

32BJ of the Service Employees International Union (the "Union"). (Third Amended Complaint

("TAC"), Dkt. 46.) Plaintiff alleges that Defendants discriminated against Plaintiff on the basis of

his race and color, and retaliated against him for reporting such discrimination, in violation of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, 42 U.S.C. §§ 1981 and 1983, and

New York State Executive Law § 296 ("NYSHRL"). (*See generally id.*) Additionally, Plaintiff

alleges that the Union breached its duty of fair representation under Title VII, breached its contractual obligations toward Plaintiff, and failed to represent Plaintiff.

Currently pending before the Court are Defendants' three separate motions to dismiss Plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Defendants' Motions to Dismiss for Failure to State a Claim, Dkts. 57, 61, 64.) For the reasons discussed below, the Court grants Defendants' motions to dismiss as to Plaintiff's Title VII, § 1981, and § 1983 claims, which are dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, which are dismissed without prejudice to renew in state court.

## BACKGROUND

I. **Facts**[1]

Plaintiff, an African-American, was employed as a maintenance worker at DOE schools. (TAC, ¶¶ 29−30.) The maintenance workers were formerly employed by the Custodian Engineers, who were, in turn, employed by the City and the DOE, and, beginning in 2016, the maintenance workers were employed by NYCSSS, a non-profit corporation. (*Id.* ¶¶ 33−37.) Plaintiff was supervised by a series of Custodian Engineers: Defendant Gerhardt from 2005 to 2015, Defendant Stiles from approximately May or June 2015 to September or October 2016, and Defendant Morgan from approximately October or November 2016 to June 2017. (*Id.* ¶¶ 38−40.) Defendants Gerhardt and Morgan are white males.[2] (*Id.* ¶¶ 42, 404.)

---

[1] For the purposes of Defendants' motions to dismiss under Fed. R. Civ. P. 12(b)(6), the Court assumes the truth of all well-pled, non-conclusory factual allegations in the TAC. *See Basile v. Levittown United Teachers*, 17 F. Supp. 3d 195, 204 (E.D.N.Y. 2014) (citing *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012)).

[2] The operative complaint does not allege the race or ethnicity of Defendant Stiles.

## A.     Plaintiff's Allegations Against Gerhardt

Plaintiff alleges that he was subject to discriminatory treatment based on his race by Gerhardt from 2009 to 2015.  (*Id.* ¶ 43.)  Plaintiff alleges that unlike the non-African-American employees, he was disciplined constantly with unnecessary write-ups, denied his usual vacation time, and terminated on three occasions.  (*Id.* ¶¶ 50−57, 63.)   Gerhardt supervised a maintenance crew of approximately eight employees, including Plaintiff.  (*Id.* ¶ 48.)  The crew consisted of three white males, one Hispanic male, two "Indian"[3] males, Plaintiff, and another African-American male, Carlton Robinson.  (*Id.* ¶ 49.)

In 2011, Plaintiff received vacation time different from what he requested, while his usual vacation time was given to Roy Millie, a white employee with less seniority.  (*Id.* ¶¶ 62, 68−71, 77.)  Plaintiff, on advice of a Union representative, decided to go on vacation on the days he requested and informed his supervisor Gerhardt that he would return to work three days late.  (*Id.* ¶¶ 78−83.)  On August 23, 2011, one day after he returned to work, Plaintiff was terminated for job abandonment.  (*Id.* ¶¶ 65−67, 83.)  An "Indian" employee was not terminated for similar behavior in 2010.  (*Id.* ¶¶ 49, 86.)  Gerhardt has never terminated any non-African-American employee who gave notice that he or she was unable to report to work when scheduled, whether returning from vacation or otherwise.  (*Id.* ¶ 95.)  Plaintiff was reinstated with a six-day suspension after a grievance hearing with the Union on September 6, 2011.  (*Id.* ¶¶ 92−94.)

On or about January 17, 2012, Plaintiff was terminated for the second time for not punching in and out when leaving the building, even though Gerhardt has never terminated any non-African-American employee for the same reason.  (*Id.* ¶¶ 97−99, 105.)  Plaintiff was reinstated without

---

[3] The Court construes this term to refer to an individual of East Indian descent.

suspension or loss of pay, after he showed at a grievance hearing with the Union that he did not leave the premise and was taking out the garbage. (*Id.* ¶¶ 101−04.)

On or about February 5, 2013, "all employees," except Roy Millie, who is white, were written up for failing to show up for snow removal. (*Id.* ¶¶ 108−113.)[4]

On or about June 18, 2013, Defendant Autar, a fireman,[5] called Plaintiff a "sorry-ass Nigger." (*Id.* ¶ 122.) After reporting the incident, Plaintiff was given a warning letter. (*Id.* ¶¶ 118−19, 125−28.) Autar did not receive any such letter. (*Id.* ¶ 129.)

On or about March 16, 2015, Plaintiff, along with Carlton Robinson, the other African-American employee in Plaintiff's maintenance crew, was terminated by Gerhardt for the third time for poor work performance. (*Id.* ¶¶ 132−37.) Plaintiff was reinstated at a grievance hearing with the Union on April 21, 2015, upon showing that he had performed his duties on the day in question. (*Id.* ¶¶ 173−78.) Plaintiff was not paid for 16 days because of the termination and the delay of the hearing. (*Id.* ¶¶ 165−66.)

On April 22, 2015, Plaintiff received a new work schedule and new assignments that were difficult and confusing to Plaintiff. (*Id.* ¶¶ 213−27.) Plaintiff thereafter was frequently written up for failure to perform, even though Gerhardt and Autar, who also had authority over Plaintiff, refused to explain Plaintiff's assignments to him. (*Id.* ¶¶ 219−22, 226, 230, 234.) Gerhardt did not cite any other non-African-American employee for similar infractions or with similar frequency. (*Id.* ¶ 218.)

---

[4] The Court notes that the operative complaint alleges both that Gerhardt "wrote up all employees" on that occasion and that Roy Millie was "never written up" for not showing up for snow removal. (TAC, ¶¶ 111, 113.)

[5] "A 'fireman' in a school setting operates and maintains boilers and other heating equipment." (Autar's Memorandum, Dkt. 64, at ECF 8.) A fireman was "next in line of authority in [the] absence of the Custodian." (TAC, ¶ 228.)

4

In all, Gerhardt issued Plaintiff 25 to 50 write-ups between 2008 and 2015, terminated Plaintiff three times on the basis of false claims of poor work performance or infractions, and denied Plaintiff his requested vacation days for six years in a row. (*Id.* ¶¶ 238−44.) When Gerhardt wrote up Plaintiff, Gerhardt would staple the write up on Plaintiff's time card for everyone to see, thereby maximizing Plaintiff's embarrassment, which Gerhardt never did to any non-African-American employee. (*Id.* ¶¶ 51−53.) Gerhardt granted all non-African-American employees' requests for specific vacation days, but denied the requests of Plaintiff and Carlton Robinson. (*Id.* ¶ 59.)

On or about May 11, 2015, Plaintiff filed a complaint of discrimination, harassment, and unequal treatment on the basis of race with the Office of Equal Opportunity and Diversity Management at the DOE ("OEO"), but the City and DOE did not investigate or take action. (*Id.* ¶¶ 246−49.)

At an unspecified time, Gerhardt reduced the sick days Plaintiff earned and did not offer Plaintiff overtime hours in accordance with the Collective Bargaining Agreement ("CBA"). (*Id.* ¶¶ 259−67, 300.)

B.    **Plaintiff's Allegations Against Stiles**

In 2015, Stiles replaced Gerhardt as Plaintiff's supervisor. (*Id.* ¶ 270.) Stiles and Gerhardt were friends and colleagues and they sat on the same Union board. (*Id.* ¶¶ 273, 306.) Like Gerhardt, Stiles denied Plaintiff's request for desired vacation time and gave that time to other employees who were not African-American. (*Id.* ¶ 274.) This scheduling required Plaintiff to work night shifts upon return from vacation, in contrast to other employees who worked day shifts. (*Id.* ¶¶ 277−81.)

On or about June 15, 2016, Stiles handed Plaintiff a note that stated "Pay Attention Forrest!" referring to the movie character, Forrest Gump.[6] (*Id.* ¶¶ 271−72.) On August 10, 2016, Stiles added to Plaintiff's workload assignments that were previously performed by five other employees, allegedly in retaliation for Plaintiff's 2015 OEO complaint against Gerhardt. (*Id.* ¶¶ 287−89.) Such a workload was only given to Plaintiff and Carlton Robinson. (*Id.* ¶ 292.) Stiles did not offer Plaintiff and Carlton Robinson overtime hours in accordance with the CBA. (*Id.* ¶¶ 300−03.)

### C. Plaintiff's Allegations Against Morgan

On or about November 2016, Morgan replaced Stiles as Plaintiff's supervisor. (*Id.* ¶ 304.) Morgan was a friend and colleague of Gerhardt and Stiles and sat on the same Union board as them. (*Id.* ¶¶ 305−06.) Morgan continued the practice of denying Plaintiff his requested vacation time. (*Id.* ¶ 307.) Morgan told Plaintiff: "[I]f you are written up on Thursdays or Fridays, you are not allowed to work overtime on the weekends." (*Id.* ¶ 314.) Morgan frequently wrote up Plaintiff and Carlton Robinson, so that they would be excluded from working overtime. (*Id.* ¶ 315.)

On or about November 22, 2016, Plaintiff received a written warning about the alleged failure to clean a staircase, even though he had cleaned the staircase. (*Id.* ¶¶ 308−12.) On or about February 3, 2017, Plaintiff received an Employee Warning Notice for failure to follow direction from Autar, even though Plaintiff had followed the direction. (*Id.* ¶¶ 316−19.) On or about March 2, 2017, Plaintiff received a second Employee Warning Notice for failure to clean. (*Id.* ¶¶ 320−22.)

---

[6] Given the nature of Plaintiff's discrimination claim, the Court notes that the character Forrest Gump is white and was played by Tom Hanks in the movie. *See* Forrest Gump (Wendy Finerman Productions 1994).

In March 2017, when Plaintiff complained to Morgan about not properly distributing overtime hours, Autar, who was present, stated that Morgan had instructed Autar not to offer Plaintiff any overtime. (*Id.* ¶¶ 323−31.) Morgan then told Plaintiff, "I have somebody for your job and [Autar's] job." (*Id.* ¶ 333.) Thereafter, Morgan allegedly told Autar that he would "get rid of [Plaintiff's] ass as [he] did Joe," an employee who had been terminated by Morgan.[7] (*Id.* ¶ 338.) Afterwards, Autar apologized to Plaintiff for assisting Morgan in denying Plaintiff overtime hours. (*Id.* ¶ 341.)

On or about June 5, 2017, Morgan transferred Plaintiff to another building that was in poor condition, even though Morgan had never transferred any non-African-American employee to another building. (*Id.* ¶¶ 342−46.) Plaintiff had to perform his job at the new building despite a lack of supplies and poor maintenance conditions. (*Id.* ¶ 347.) Around the same time, Morgan also denied "everyone" their vacation and advised Plaintiff to file a grievance with the Union. (*Id.* ¶ 354.)

On or about June 12, 2017, Plaintiff received a Schedule and Directive from Morgan to limit personal conversations with staff, which Plaintiff believed was intended to generate a negative document in Plaintiff's file. (*Id.* ¶¶ 360−61.) The Directive also falsely stated that Plaintiff left garbage throughout his section. (*Id.* ¶ 362.)

On or about June 13, 2017, Morgan terminated Plaintiff, falsely claiming that Plaintiff's area was found in poor condition. (*Id.* ¶¶ 373−74.) Carlton Robinson has also been terminated.[8] (*Id.* ¶ 406.)

---

[7] The operative complaint does not allege Joe's race or ethnicity.

[8] The operative complaint does not indicate when or why Carlton Robinson was terminated.

### D. Plaintiff's Allegations Against the Union

Plaintiff's allegations against the Union are based on events in 2015 and 2017. First, Plaintiff alleges that the Union failed to respond to Plaintiff's grievances and complaints in 2015. (*Id.* ¶¶ 147−64, 173−78, 250−57.) Second, Plaintiff alleges that, in 2017, the Union failed to represent him in connection with his grievances over the denial of vacation time and his termination. (*Id.* ¶¶ 357, 377−79.)

More specifically, Plaintiff's allegations regarding the Union consist of the following. The Union held a hearing regarding Plaintiff's June 13, 2017 termination by Morgan on June 20, 2017, the date on which Plaintiff's complaint about the denial of vacation time was originally scheduled for hearing. (*Id.* ¶¶ 377−80.) As a result, Plaintiff never received a hearing on that complaint and was not paid earned vacation time upon his termination. (*Id.* ¶ 380.) Before the commencement of the June 20, 2017 termination hearing, the Union and Morgan discussed Plaintiff's termination outside of Plaintiff's presence. (*Id.* ¶¶ 383−84.) All of the people at the hearing except for Plaintiff were white. (*Id.* ¶ 404.) At the hearing, Plaintiff provided photographic evidence showing that he was terminated based on false information. (*Id.* ¶¶ 387, 399.) The Union had promised, but failed, to provide legal counsel, and failed to provide a written Step I grievance decision. (*Id.* ¶¶ 397−98, 417.) The Union did not schedule a Step II hearing and informed Plaintiff on September 18, 2017, that it would not move forward with Plaintiff's case. (*Id.* ¶¶ 409−11.)

## II. Procedural History

Plaintiff filed his complaint with the EEOC on June 26, 2017. (*Id.* ¶ 408.) Plaintiff filed this suit on December 29, 2017. (Complaint, Dkt. 1.) Plaintiff amended his complaint three times:

(1) on August 16, 2018; (2) September 25, 2018; and (3) November 12, 2018.[9]  (Amended

Complaint, Dkt. 37; Amended Complaint, Dkt. 43; Amended Complaint, Dkt. 46.)  Defendants'

motions to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) were fully briefed on January

25, 2019.  (Defendants' Letters, Dkts. 49, 50, 51.)

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully."  *Id.* (citation omitted).  Determining whether a complaint states a plausible claim for

relief is "a context-specific task that requires the reviewing court to draw on its judicial experience

and common sense."  *Id.* at 679 (citation omitted); *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir.

2013).

In addressing the sufficiency of a complaint, courts are required to accept the well-pleaded

factual allegations contained within the complaint as true, *see Building Indus. Elec. Contractors*

---

[9] The Court granted Plaintiff permission all three times to file the amended complaint—the period for amendment as of right under Fed. R. Civ. P. 15(a) having long passed by the time Plaintiff first sought to amend—and each amended complaint was prompted by a defense request to file a motion to dismiss the action.  (*See* July 17, 2018 Order; September 11, 2018 Order; and November 8, 2018 Order.)  Notably, with respect to the first amended complaint, Plaintiff's counsel inadvertently filed a draft version of the complaint, necessitating the filing of the final version the next day (Dkts. 36, 37), and with respect to the third amended (and operative) complaint, Plaintiff's counsel filed a version that shows the red-lined changes and edits made to the complaint (Dkt. 46).

*Ass'n v. City of New York*, 678 F.3d 184, 188 (2d Cir. 2012), but "need not credit conclusory

statements unsupported by assertions of facts or legal conclusions . . . presented as factual

allegations," *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001)

(citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Additionally,

> a court need not feel constrained to accept as truth conflicting pleadings that make
> no sense, or that would render a claim incoherent, or that are contradicted either by
> statements in the complaint itself or by documents upon which its pleadings rely,
> or by facts of which the court may take judicial notice.

*Id.* at 405–06 (citing *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995)).

## DISCUSSION

### I.      Claims Against the City of New York

All claims against the City are dismissed.  "The City and the DOE are separate legal

entities, and the City cannot be held liable" for the conduct of DOE employees.  *Sotomayor v. City

of New York*, 862 F. Supp. 2d 226, 248 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013);

*Missick v. City of New York*, 707 F. Supp. 2d 336, 346 (E.D.N.Y. 2010).  Plaintiff does not allege

any direct participation by the City, and therefore the City is not a proper party and must be

dismissed.

### II.     Title VII Claims Against Municipal Defendants[10]

#### A.      Timeliness

Municipal Defendants contend that Plaintiff's claims premised on incidents before

August 30, 2016 are time-barred.  (Municipal Defendants' Memorandum, Dkt. 61, at ECF[11] 9–10;

---

[10] Although Defendant Autar raised arguments in his briefing regarding Plaintiff's Title
VII claims, the Court notes he is not named in any of these claims.

[11] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing
system and not the document's internal pagination.

Autar's Memorandum, Dkt. 64, at ECF 3–4, 7, 9, 12.)[12]  Title VII requires a plaintiff who has filed a discrimination claim with a state or local equal employment agency to file a charge of discrimination with the EEOC within 300 days of the alleged discriminatory act.  *See* 42 U.S.C. § 2000e–5(e); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996).  Plaintiff responds that his hostile work environment claims are saved by the continuing violation doctrine, *i.e.*, that his claim is not time-barred under Title VII because conduct alleged as part of that claim falls within the statutory period.  (Plaintiff's Memorandum, Dkt. 66, at ECF 11–12); *see Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 205 (E.D.N.Y. 2014) (internal quotation marks omitted) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)) (explaining that the continuing violation exception provides that "the entire time period of the alleged hostile environment may be considered . . . if an act contributing to the claim occurs within the filing period").

### 1.    Discrete Acts of Alleged Discrimination

A plaintiff may not recover for claims of discrimination based on discrete acts that occurred outside of the statutory period, "even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113–14; *Benjamin v. Brookhaven Sci. Assocs., LLC*, 387 F. Supp. 2d 146, 153 (E.D.N.Y. 2005) ("These discrete acts cannot be transformed into 'a single unlawful practice for the purposes of timely filing.'") (internal citation omitted).  Discrete acts

---

[12] Municipal Defendants also argue in their reply brief that Plaintiff's hostile work environment claim must be dismissed as untimely, because it was not alleged in Plaintiff's EEOC complaint.  (Municipal Defendants' Reply, Dkt. 62, at ECF 7.)  However, the exhaustion defense was not properly raised in any Defendant's Motion to Dismiss and the Court, therefore, declines to rule on this issue.  *In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017), *modified*, No. 12-MISC-381, 2017 WL 564676 (S.D.N.Y. Feb. 13, 2017) ("Generally, a court does not consider issues raised in a reply brief for the first time because if a party raises a new argument in a reply brief the opposing party may not have an adequate opportunity to respond to it.").

include termination, refusal to hire, failure to promote, denial of transfer or undesirable transfer, failure to compensate adequately, and denial of preferred job assignments. *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 114; *Benjamin*, 387 F. Supp. 2d at 153; *Costanzo v. U.S. Postal Serv.*, No. 00-CV-5044 (NRB), 2003 WL 1701998, at *5 (S.D.N.Y. Mar. 31, 2003) (collecting cases).

Plaintiff filed a charge of discrimination with the EEOC on June 26, 2017. Thus, Plaintiff's Title VII claims based on discrete acts that occurred prior to August 30, 2016—including terminations, disciplinary actions, failures to offer overtime hours, failures to grant vacation time, failures to compensate adequately, and undesirable assignments—are time-barred. *See Benjamin*, 387 F. Supp. 2d at 153.

### 2. Hostile Work Environment Claim

Hostile work environment claims are different from discrete acts, because "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp.*, 536 U.S. at 117. The continuing violation exception provides that "the entire time period of the alleged hostile environment may be considered . . . if an act contributing to the claim occurs within the filing period." *Bowen-Hooks*, 13 F. Supp. 3d at 205 (internal quotation marks omitted) (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 117). There must be "at least one *timely* discriminatory act that is part of the alleged pattern or practice" that forms the basis of the hostile work environment claim. *Gerardi v. Huntington Union Free Sch. Dist.*, 124 F. Supp. 3d 206, 222 (E.D.N.Y. 2015) (citing *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 76 (2d Cir. 2010)) (emphasis added). "Discrete incidents of discrimination that are unrelated to the hostile work environment . . . cannot be part of a continuing violation and cannot supply the hook to bring an otherwise untimely hostile work environment

claim into the 300[-]day time period." *Szuszkiewicz v. JPMorgan Chase Bank*, 12 F. Supp. 3d 330, 338–39 (E.D.N.Y. 2014). In determining whether the exception applies, courts are required "to make an individualized assessment of whether incidents and episodes are related," such that they can be considered "part of the same actionable hostile work environment practice." *McGullam*, 609 F.3d at 76.

Here, the operative complaint does not specifically allege a hostile work environment claim. (*See* TAC, ¶¶ 427−46 (First Count alleging Title VII discrimination against Municipal Defendants).) Because Plaintiff is represented by counsel in this matter, the Court is not obligated to liberally construe his TAC to allege a hostile work environment claim. *See Jones v. Bay Shore Union Free Sch. Dist.*, 947 F. Supp. 2d 270, 278 (E.D.N.Y. 2013) ("Plaintiff is not *pro se*, and therefore not entitled to a liberal reading of the Complaint."). Nor can Plaintiff's argument now in response to the dismissal motion—asserting for the first time a "continuing [Title VII] violation" (Plaintiff's Memorandum, Dkt. 66 at ECF 11−12), *i.e.*, a hostile work environment claim—be used to further amend his complaint to add such a claim. *See Blue v. City of New York*, No. 16-CV-9990 (VSB), 2018 WL 2561023, at *12 (S.D.N.Y. June 4, 2018) (noting that "a plaintiff typically cannot amend a complaint through claims raised for the first time in an opposition").

In any event, Plaintiff fails to state a hostile work environment claim, because the allegations in the operative complaint are insufficient to show that "the workplace [was] permeated with 'discriminatory intimidation, ridicule, and insult,' that [was] 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). Accepting Plaintiff's allegations as true, the Court observes that, during the last nine years of Plaintiff's 21-year employment as a DOE maintenance worker, he was subjected to the denial of vacation time

and overtime, increases in his workload, write-ups, disciplinary actions, under-compensation, undesirable work assignments, and terminations—conditions that, while seemingly unfair and harsh to Plaintiff, are insufficient to establish a hostile work environment. *See Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) (finding allegations of negative comments, harsh tones, refusals to meet with Plaintiff, wrongful reprimands, and increase of Plaintiff's schedule insufficient to state a hostile work environment claim); *Isbell v. City of New York*, 316 F. Supp. 3d 571, 591–92 (S.D.N.Y. 2018) (finding harsh criticisms, denial of use of company vehicle, discipline for inadequate work product, refusal to authorize overtime, denial of training opportunities, and refusal to communicate with Plaintiff insufficient to state a hostile work environment claim).

In addition, Plaintiff fails to show that any hostility or harsh treatment he was subjected to was due to his race. *See Fordham v. Islip Union Free Sch. Dist.*, 662 F. Supp. 2d 261, 273 (E.D.N.Y. 2009) (noting that, for incidents to suffice to establish a hostile work environment, they "must occur under circumstance[s] in which the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition"). Although Plaintiff alleges that Carlton Robinson, the only other African-American employee, and he were constantly written up and denied overtime hours, similar treatment for people of the same race is insufficient to state a hostile work environment claim when the acts themselves do not rise to the level of an abusive work environment. *See Isbell*, 316 F. Supp. 3d at 591–92 (dismissing the hostile work environment claim alleged by multiple plaintiffs for similar treatments). And although Plaintiff alleges that non-African-Americans were treated better or differently than Plaintiff in a few instances (*see, e.g.*, TAC, ¶¶ 95, 105, 113, 292, 315), these allegations are far too sporadic and conclusory to support a plausible inference that any unfavorable treatment Plaintiff received was motivated by

racial animus. *See Harris*, 510 U.S. at 21 (claim of hostile work environment requires showing that Plaintiff's "workplace is permeated with '*discriminatory* intimidation, ridicule, and insult that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment'" (emphasis added)). Indeed, the only overtly racial incident that Plaintiff alleges is a comment made by his co-worker Defendant Autar in June 2013. (TAC, ¶ 122 (alleging that Autar called Plaintiff a "sorry-ass Nigger").) Despite Plaintiff, and not Autar, being disciplined for this incident (*id.* ¶¶ 128−32), this single event over the course of Plaintiff's 21 years as a DOE maintenance worker, or even over the last nine years of his DOE employment, is a plainly insufficient basis from which to infer the existence of a hostile work environment or to infer discriminatory intent on the part of Plaintiff's supervisors, Defendants Gerhardt, Stiles, and Morgan.[13]

In sum, the Court finds that because Plaintiff has not sufficiently alleged a hostile work environment claim, all conduct that occurred after August 30, 2016 constitute discrete acts of

---

[13] To prevail on a hostile work environment claim based on racially derogatory comments, "[t]he plaintiff must show more than a few isolated incidents of racial enmity, although a hostile work environment can also be established through evidence of a single incident of harassment that is extraordinarily severe." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 724 (2d Cir. 2010) (internal quotations, citations, and brackets omitted). The Court acknowledges that non-binding precedent within this Circuit indicates that "[t]here may well exist circumstances where a single use of the word 'nigger' would rise to the level of a hostile work environment." *Albert-Roberts v. GGG Constr., LLC*, 542 F. App'x 62, 64 (2d Cir. 2013) (summary order); *compare La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 210 (2d Cir. 2010) (summary order) (finding that allegations of four instances of a company manager "physically threaten[ing] [the plaintiff] and call[ing] him a 'nigger,'" coupled with other racial slurs, were sufficient to survive a motion to dismiss), *with Albert-Roberts*, 542 F. App'x at 64 (finding that "several incidents involving [a co-worker], the most severe of which [was] a single use by [the co-worker] of the word 'nigger' to plaintiff's husband," was insufficient to establish a hostile work environment). Finding the facts in *Albert-Roberts* more analogous to those at issue here than the facts in *La Grande*, the Court holds that the single explicitly racist comment alleged to have been made in this case fails to meet the hostile work environment standard. *See Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011) (noting that "denying summary orders precedential effect does not mean that the court considers itself free to rule differently in similar cases") (internal quotation and brackets omitted).

alleged discrimination that were not part of a continuing violation. Accordingly, Plaintiff's untimely claims arising out of events prior to August 30, 2016 are dismissed. *Szuszkiewicz*, 12 F. Supp. 3d at 338–39 ("Discrete incidents of discrimination that are unrelated to the hostile work environment . . . cannot be part of a continuing violation and cannot supply the hook to bring an otherwise untimely hostile work environment claim into the 300[-]day time period."). However, the Court will consider acts outside of the statutory period as background information providing context for Plaintiff's claims. *See Bowen-Hooks*, 13 F. Supp. 3d at 208 (citing *Davidson v. LaGrange Fire Dist.*, 523 F. App'x 838, 839 (2d Cir. 2013) (summary order)).

**B.    Failure to State a Discrimination Claim**

Municipal Defendants further contend that Plaintiff's Title VII claim should be dismissed because the operative complaint fails to state any adverse employment action or a minimal inference of discriminatory motivation. (Municipal Defendants' Memorandum, Dkt. 61, at ECF 12–17.)

At the pleading stage, a plaintiff alleging discrimination needs to show "(1) that [he] is a member of a protected class; (2) that [he] was qualified for employment in the position; (3) that [he] suffered an adverse employment action; and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation . . . ." *Littlejohn*, 795 F.3d at 307. Plaintiff need not allege a *prima facie* case of discrimination to survive a motion to dismiss. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002) (noting that "a complaint in an employment discrimination lawsuit [need not] contain specific facts establishing a *prima facie* case of discrimination"). The facts alleged "need only give plausible support to a minimal inference of discriminatory motivation." *Littlejohn*, 795 F.3d at 311.

1.    <u>Adverse Employment Action</u>

16

"An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Joseph v. Leavitt*, 465 F.3d 87, 80 (2d Cir. 2006) (internal quotation marks omitted). It is "a materially significant disadvantage with respect to the terms of [the plaintiff's] employment." *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (internal quotation marks and citation omitted). Examples "include termination, demotion, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities." *Littlejohn*, 795 F.3d at 312 n.10 (internal quotation marks omitted). As there are "no bright-line rules," the Court must "pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" *Islamic Soc'y of Fire Dep't Pers. v. City of New York*, 205 F. Supp. 2d 75, 83 (E.D.N.Y. 2002) (internal quotation marks and citation omitted).

"Criticism of an employee in the course of evaluating and correcting her work is not, in itself," an adverse employment action. *Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 226 (E.D.N.Y. 2016). Neither are "negative reports or evaluations," *Bowen-Hooks*, 13 F. Supp. 3d at 217, or close monitoring and "excessive scrutiny" by a supervisor, *Jaeger*, 191 F. Supp. at 226. These experiences can only be considered adverse employment actions "when they give rise to material adverse changes in work conditions." *Bowen-Hooks*, 13 F. Supp. 3d at 217 (internal citation omitted).

Plaintiff has clearly alleged at least one adverse employment action: his final termination in June 2017. Whether other alleged conduct—such as the increase in his workload, disparate treatment in terms of overtime and vacation time, under-compensation, and false write-ups—were adverse employment actions depends on whether "they [gave] rise to material adverse changes in [Plaintiff's] work conditions." *Id.* (internal citation omitted). Because, as discussed *infra*, the Court finds that Plaintiff has not sufficiently alleged facts giving plausible support to even a

minimal inference of discrimination, the Court assumes for purposes of this motion that Plaintiff has sufficiently alleged that he suffered one or more adverse employment actions.

### 2. Inference of Discrimination

An inference of discrimination can arise from circumstances such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms; [] its invidious comments about others in the employee's protected group; [] the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (internal quotation marks omitted) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir.2009)). "A plaintiff relying on disparate treatment evidence must show [he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [himself]." *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). Although the question of whether a comparator is similarly situated to the plaintiff is generally a question of fact for the jury to decide, "the plaintiff must at least plead allegations from which it is plausible to conclude the comparators are similarly situated." *Blige v. City Univ. of N.Y.*, No. 15-CV-8873 (GBD) (KHP), 2017 WL 498580, at *9 (S.D.N.Y. Jan. 19, 2017) (internal quotation marks omitted).

The Court first examines the alleged conduct falling within the statutory period, *i.e.*, between August 30, 2016 and the filing of the complaint. Plaintiff does not allege the use of any ethnically degrading language or invidious comments about others in Plaintiff's classification during this period. Nor does Plaintiff provide any facially neutral comments that could be related to Plaintiff's protected characteristics. Rather, Plaintiff relies exclusively on allegations that white employees were afforded more favorable treatment than Plaintiff and the only other African-American employee in his group. Specifically, Plaintiff alleges that his supervisors assigned the African-American employees more work and violated the CBA in offering white employees with

less seniority overtime hours and granting them vacation time that Plaintiff had requested. However, Plaintiff does not identify any non-African-American employees who received preferential treatment within the statutory period. For example, Plaintiff alleges that he and Carlton Robinson were always written up on Thursdays and Fridays, which meant they were excluded from working overtime,[14] but Plaintiff does not identify any non-African-American employee who was not written up on those days or excluded from overtime. (*Id.* ¶ 315.)

Even if the Court were to consider events outside the statutory period, Plaintiff fails to allege a minimal inference of discrimination. The only race-related incident occurred on June 18, 2013, three years before the statutory period. (*Id.* ¶ 118.) In that incident, Autar called Plaintiff a "sorry-ass Nigger" and Plaintiff, but not Autar, was given a warning letter after he reported the incident.[15] (*Id.* ¶¶ 125−29.) Even accepting all factual allegations as true and drawing from them all reasonable inferences, the Court still cannot make the inferential leap that the alleged disparate treatment and the disciplinary actions that are not time-barred were racially motivated, as the Autar incident happened three years before the first adverse employment action within the statutory period and while Plaintiff was working under a different supervisor. *See Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110 (2d Cir. 2011) (summary order) ("[S]tray comments [by a colleague who played no role in the plaintiff's termination] do not create an inference of discrimination."); *see Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) ("Stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination."). Although Plaintiff tries to suggest that the intent and conduct of

---

[14] (*See* TAC, ¶ 314 (Morgan telling Plaintiff that, "if you are written up on Thursdays or Fridays, you are not allowed to work overtime on the weekends").)

[15] Bizarrely, it was also Autar who apologized to Plaintiff for assisting Morgan in denying Plaintiff overtime hours. (*Id.* ¶ 341.)

each of his three supervisors—Gerhardt, Stiles, and Morgan—should be attributed to the other two, because they were friends and all served on the same Union board (TAC, ¶ 306), these allegations are simply insufficient to support any inference of collective intent or racial animus. *Cf. Abboud v. Cty. of Onondaga, N.Y.*, 341 F. Supp. 3d 164, 187 (N.D.N.Y. 2018) (holding that evidence of defendants being friends with each other is insufficient to state a conspiracy to discriminate); *Kohlhausen v. SUNY Rockland Cmty. Coll.*, No. 7:10-CV-3168 (JSG), 2011 WL 2749560, at *8 (S.D.N.Y. July 13, 2011) (holding that the friendship between the supervisor and the coworker who was harassing the plaintiff is insufficient to state a claim of discrimination against the supervisor).

Plaintiff also fails to provide a comparator who was similarly situated to Plaintiff. Plaintiff alleges that he did not receive his requested vacation days while Autar did. (TAC, ¶¶ 287−89.) Autar, a fireman for the DOE (*id*. ¶¶ 25, 115, 186), was not similarly situated because he held a different job than Plaintiff, a maintenance worker, and thus could have been subject to different leave policies. (*Id.* ¶ 115.) *See Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 21 (E.D.N.Y. 2015) ("The employees' positions, job responsibilities, and reporting structures are relevant."). Furthermore, the complaint itself suggests that Autar occupied a higher position and/or had more seniority than Plaintiff (TAC, ¶ 186 (describing a fireman as a "second in line supervisor")), and thus could have been entitled to more vacation time than Plaintiff. Plaintiff also alleges that Gerhardt gave the vacation time requested by Plaintiff to Roy Millie, a white employee and a friend of Gerhardt who had less seniority than Plaintiff, but Plaintiff does not allege sufficient information from which to infer that Millie and Plaintiff were similarly situated in all material respects, *e.g.*, Millie's position versus Plaintiff's position. (*Id.* ¶¶ 76−77.)

Even though Plaintiff alleges that Millie was part of Plaintiff's "maintenance crew," the fact that Autar, also a member of this crew, was a "fireman" and a "second in line supervisor," indicates that not all employees in this group did the same job or occupied the same position. (*Id.* ¶¶ 48−49, 186.) The fact that Plaintiff had to work a different schedule than other employees in the "maintenance crew" because of the special schedule the school, where Plaintiff worked, kept indicates that Plaintiff and other maintenance workers worked different schools or buildings. (*Id.* ¶¶ 275−80.) Plaintiff's allegation that all other non-African-American employees were granted their requested vacation days is similarly insufficient for failure to allege material similarity between Plaintiff and the non-African-American employees. (*Id.* ¶ 59.) Nor does Plaintiff allege any facts suggesting that Gerhardt's preferential treatment toward Millie at the expense of Plaintiff was connected to animus against Plaintiff because of his race. Plaintiff even acknowledges that Millie was friends with Gerhardt and was given preferential treatment over all other employees. (*Id.* ¶ 42.) *See Bermudez v. City of New York*, 783 F. Supp. 2d 560, 581 (S.D.N.Y. 2011) ("[T]here are no allegations connecting [the defendant's] [decision not to grant the plaintiff any sick or vacation days] to animus against [the plaintiff] because of her race."). Similarly, Plaintiff alleges that he, along with every other employee, was written up once in 2013 for not showing up for snow removal, with Millie being the only exception—which means that non-African-American employees were also written up on that occasion. (TAC, ¶¶ 108−09, 111, 113.) Though Plaintiff alleges that he was written up far more times than others in his crew and his writeups were particularly embarrassing (*see, e.g.*, *id.* ¶¶ 51−53, 111), he offers no facts to support an inference that these write-ups were racially motivated.

Finally, Plaintiff claims that his 2017 termination—the only one within the statutory period—occurred because of his race, but "the sequence of events leading to [Plaintiff's]

discharge" does not give rise to an inference of discrimination.  *See Littlejohn*, 795 F.3d at 312.  The events precipitating Plaintiff's termination do not indicate any racial animus.  Plaintiff was informed that he was terminated for failure to complete tasks assigned to him.  (TAC, ¶¶ 373−74.)  Although Plaintiff disputes the truth of the matter, Plaintiff does not allege any facts showing that race was a motivating factor.  Plaintiff alleges that Carlton Robinson, the other African-American employee, was terminated as well, but does not provide any context for Robinson's termination or allege that similarly situated non-African-American employees were not terminated after having engaged in the same or similar conduct.  (*Id.* ¶ 406.)  The only allegations Plaintiff is left with to suggest a minimal inference of racial animus are the same ones underlying the alleged disparate treatment described above.  However, the Court has already determined that those allegations do not plausibly support even a minimal inference of discriminatory motive.

Accordingly, Plaintiff's Title VII discrimination claim is dismissed for failure to state a claim.

### C.  Failure to State a Retaliation Claim

Defendants contend that Plaintiff's Title VII retaliation claim fails because the complaint does not show any causal connection between the protected activity and the adverse actions alleged in the TAC.  (Municipal Defendants' Memorandum, Dkt. 61, at ECF 17−19.)

To survive a motion to dismiss on a retaliation claim, a plaintiff must allege facts that show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Littlejohn*, 795 F.3d at 315–16.  As with discrimination claims, "the allegations in the complaint need only give plausible support to the reduced *prima facie* requirements."  *Id.* at 316.

To plead a causal connection, "the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action . . . [*i.e.*,] the adverse action would not have occurred in the absence of the retaliatory motive." *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) (internal citation omitted). A causal connection can be shown "either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.2000)). When temporal proximity between the protected activity and the adverse employment action is invoked to support an inference of retaliatory intent, "the Supreme Court has suggested that the temporal proximity must be very close." *Riddle v. Citigroup*, 640 F. App'x 77, 79 (2d Cir. 2016) (summary order) (internal quotation marks omitted) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

While courts have not "drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated," a time period exceeding one year without additional evidence has been consistently held to be insufficient to establish a causal connection. *E.g.*, *Riddle*, 640 F. App'x at 79 (16 months); *Shaw v. McDonald*, 715 F. App'x 60, 62 (2d Cir. 2018) (summary order) (12 months); *see Fraser v. MTA Long Island Rail Rd.*, 307 F. Supp. 3d 105, 116 (E.D.N.Y. 2018) ("In the cases in which there have been relatively lengthy gaps between the protected activity and the adverse employment action, however, there has generally been other evidence to suggest retaliation."); *cf. Brown v. City of New York*, 622 F. App'x 19, 20 (2d Cir. 2015) (summary order) (holding that two months did not establish a sufficient nexus); *Murray v. Visiting Nurse Servs. of*

*N.Y.*, 528 F. Supp. 2d 257, 276 (S.D.N.Y. 2007) (holding that seven months did not establish a sufficient nexus).

Plaintiff does not allege any direct evidence of retaliatory animus. Instead, he attempts to rely on the fact that at the June 20, 2017 grievance hearing regarding Plaintiff's termination, NYCSSS representative Arthur inquired about Morgan's knowledge of any interactions between Plaintiff and Gerhardt. (TAC, ¶¶ 384, 391.) The Court fails to see how this line of questioning could be construed as demonstrating any retaliatory motive. Indeed, given that Plaintiff was alleging unfair treatment by his supervisors, including Morgan, the supervisor who terminated Plaintiff on June 13, 2017, these questions were logically related to the merits of Plaintiff's grievance claims.

In addition, Plaintiff relies on indirect evidence to establish causation, contending that retaliation can be inferred from temporal proximity. Plaintiff first complained about the alleged discrimination to the OEO on May 11, 2015.[16] (*Id.* ¶¶ 246−49.) Notwithstanding the statutory period of 300 days, the next concrete "adverse employment action" Plaintiff alleges occurred on June 15, 2016, 13 months after the complaint, when Plaintiff's new supervisor, Stiles, called Plaintiff "Forrest," referring to Forrest Gump. (*Id.* ¶¶ 271−72.) This lengthy gap in time between the filing of Plaintiff's OEO complaint and the first adverse employment action thereafter undercuts any inference of a causal connection, and Plaintiff does not allege any other facts to support one.

Plaintiff also alleges, without providing a time frame, that when Stiles took over from Gerhardt, he continued the practice of giving vacation days requested by Plaintiff to other

---

[16] Plaintiff mentions in passing a complaint filed in 2012 with the OEO in his opposition brief, but never refers to it in his TAC. (Plaintiff's Memorandum, Dkt. 66, at ECF 23.) The Court thus does not contemplate the existence and effects of such complaint.

employees. (*Id.* ¶ 274.) However, Plaintiff also acknowledges that the school he was assigned to had a different schedule than other schools and his vacation time was scheduled so that he would return to work when his school opened. (*Id.* ¶¶ 275−77.) Although the definition of an adverse employment action in the context of retaliation is broader than in the context of discrimination, the allocation of vacation time to accommodate the needs of the job is not the kind of employment action that would "dissuade a reasonable worker from making or supporting a charge of discrimination[,]" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006), and thus does not constitute an adverse employment action for purposes of a Title VII retaliation claim.

Accordingly, Plaintiff's Title VII retaliation claim is dismissed for failure to state a claim.

## III.    Title VII Claims Against the Union

Defendant Union contends that Plaintiff's Title VII claims fail as to it because Plaintiff does not allege that the Union's conduct was motivated by discriminatory or retaliatory intent.

Under Title VII, it is unlawful for a labor union to discriminate against any individual because of his or her race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(c)(1). To bring a Title VII discrimination claim against a union concerning the manner in which the union handled a member's workplace complaints, a plaintiff must demonstrate that (1) the Union breached its duty of fair representation ("DFR") to plaintiff; and (2) that the Union's conduct was motivated by animus toward the plaintiff's protected status. *McIntyre v. Longwood Cent. Sch. Dist.*, 380 F. App'x 44, 49 (2d Cir. 2010) (summary order). To bring a Title VII retaliation claim against a union, a plaintiff must show that "(1) [he] was engaged in an activity protected under Title VII and known to the union; (2) [he] suffered adverse union action; and (3) there was a causal connection between the protected activity and the union's actions." *Agosto v. Corr. Officers Benev. Ass'n*, 107 F. Supp. 2d 294, 309 (S.D.N.Y. 2000).

Plaintiff alleges that the Union acquiesced in other Defendants' discriminatory conduct, agreed to a 16-day suspension for Plaintiff, met with other Defendants without Plaintiff on the day of the termination hearing, and failed to appeal Plaintiff's grievance over his last termination. However, the TAC is entirely devoid of allegations suggesting that the Union harbored animosity toward Plaintiff on the basis of race or sought to retaliate against Plaintiff for engaging in protected activity. *See Robinson v. Macy's*, No. 14-CV-4937 (CM), 2014 WL 6997598, at *10 (S.D.N.Y. Dec. 5, 2014) ("The mere fact that Plaintiff is a member of a suspect class, without more, does not give rise to the inference that her race, her religion[,] or her national origin motivated the Union's decision not to pursue her grievances."). The only arguably relevant fact alleged in the TAC is that Gerhardt sat on the board of the Union, but Plaintiff does not allege how that affected the Union's decision not to further pursue Plaintiff's grievance. *Cf. Vaughn v. Am. Tel. & Tel. Co.*, 92 F. App'x 21, 23 (2d Cir. 2004) (summary order) ("Absent a showing that the union's conduct was arbitrary, discriminatory, or in bad faith, the court should not second-guess the union's decision not to pursue [Plaintiff's grievance].").

Accordingly, Plaintiff's Title VII discrimination and retaliation claims against the Union are dismissed.

## IV. Section 1981 and Section 1983 Claims

Defendants' arguments regarding Plaintiff's discrimination and retaliation claims under 42 U.S.C. §§ 1981 and 1983 are similar to those they raise with respect to Plaintiff's Title VII claims.[17] (Municipal Defendants' Memorandum, Dkt. 61, at ECF 12; Autar's Memorandum, Dkt.

_____

[17] Defendant Autar also argues that Plaintiff cannot state a § 1981 claim against Autar because of the lack of a contractual relationship. (Autar's Memorandum, Dkt. 64, at ECF 14.) The Court agrees that "liability under § 1981 for interference with a third-party contract attaches only to persons who actually had the power or authority to prevent the [plaintiff] from contracting

64, at ECF 16–17.)  Claims of employment discrimination and retaliation under §§ 1981 and 1983 are analyzed under the same framework that applies to Title VII claims.  *See Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (§§ 1981 and 1983 discrimination claims); *Fincher*, 604 F.3d at 720 (§ 1981 retaliation claim); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015) (§ 1983 retaliation claim).  Although §§ 1981 and 1983 have a longer statute of limitations than Title VII,[18] because the Court has taken into consideration Plaintiff's allegations beyond the Title VII statutory period and determined that Plaintiff fails to state a claim of discrimination or retaliation, the Court grants Defendants' motion to dismiss §§ 1981 and 1983 claims for the same reasons underlying the dismissal of Plaintiff's Title VII claims.

Defendants also contend that Plaintiff's § 1983 claims against the DOE fail because he does not sufficiently allege a municipal policy or custom under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978).  Indeed, Plaintiff does not allege that his supervisors were "acting pursuant to an expressly adopted official policy" or "a longstanding practice or custom" or that his supervisors "were acting as [] 'final policymaker[s].'"  *See Hurdle v. Bd. of Educ. of City of New York*, 113 F. App'x 423, 424–25 (2d Cir. 2004) (summary order).  Therefore, the Court finds that Plaintiff's § 1983 claims fail as against the DOE.[19]

---

[18] Generally, claims brought under § 1981 have a statute of limitations of four years. *Wright v. City of Ithaca*, 633 F. App'x 63, 64 (2d Cir. 2016) (summary order) (citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004)).  When a plaintiff asserts violations of § 1981 rights against state actors through § 1983, some courts have applied a four-year statute of limitations while others have applied the three-year statute of limitations of § 1983.  *See Sosa v. New York City Dep't of Educ.*, 368 F. Supp. 3d 489, 509 n.12 (E.D.N.Y. 2019) (collecting cases). The Court need not resolve this issue, because Plaintiff's claims fail even when the Court considers the entire course of the alleged conduct.

with the third party," and that Plaintiff has not alleged any facts that Autar had such authority. *Ginx, Inc. v. Soho All.*, 720 F. Supp. 2d 342, 358 (S.D.N.Y. 2010), *as corrected* (Aug. 19, 2010).

[19] Defendants also argue that the individual Defendants' liability in their individual capacity is limited by "personal involvement."  *See Smith v. Town of Hempstead Dep't of*

Defendants further contend that Plaintiff's § 1983 conspiracy claim fails because he only makes conclusory allegations of a conspiracy. *See Ying Li v. City of New York*, 246 F. Supp. 3d 578, 620 (E.D.N.Y. 2017) (citing *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002)) ("Complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed . . . ."). The Court finds that Plaintiff fails to plead any factual allegations showing a conspiracy and, therefore, fails to state a § 1983 conspiracy claim.

## V. State Law Claims

Plaintiff also raises a NYSHRL claim against all Defendants alleging discrimination and retaliation, as well as contract claims against the Union. Typically, where "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (internal quotation marks and citation omitted); *see also* 28 U.S.C. § 1367(c)(3) (where a court "has dismissed all claims over which it has original jurisdiction," it "may decline to exercise supplemental jurisdiction" over remaining state law causes of action). The Court declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL and contract claims. *Meyer v. State of New York Office of Mental Health*, 174 F. Supp. 3d 673, 695 (E.D.N.Y. 2016), *aff'd sub nom. Meyer v. New York State Office of*

---

*Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 455 (E.D.N.Y. 2011) ("[T]o prove individual liability based on either of these causes of action, a plaintiff [must] show that the individual was personally involved in the alleged violations of rights."). Because the Court dismisses Plaintiff's claims under §§ 1981 and 1983 entirely, the Court need not reach this issue.

*Mental Health*, 679 F. App'x 89 (2d Cir. 2017) (summary order).  These claims are dismissed without prejudice to renew in state court.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are granted with respect to Plaintiff's Title VII, § 1981, and § 1983 claims, which are dismissed with prejudice.  Because the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, those are dismissed without prejudice to renew in state court.  The Clerk of Court is respectfully directed to enter judgment consistent with this Order, and terminate this action.

SO ORDERED.

/s/ *Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 18, 2019
      Brooklyn, New York